NOTICE

Decision filed 10/07/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230531-U

NO. 5-23-0531

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 18-CF-366 |
| | ) | |
| CHARLES W. BROADWAY, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HACKETT* delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court erred in denying the defendant's motion to suppress his un-Mirandized inculpatory statements where the statements were made involuntarily and while the defendant was in custody. Because the admission of the statements was not harmless error, we vacate the trial court's judgments of non-acquittal and remand for a new discharge hearing at which the inculpatory statements shall be excluded.

¶ 2    The defendant, Charles W. Broadway, appeals the trial court's findings that he was not "not guilty" of two counts of predatory criminal sexual assault of a child and one count of aggravated criminal sexual abuse.[1] The defendant contends that the evidence presented was insufficient to sustain the trial court's judgments of non-acquittal beyond a reasonable doubt on all

_____

*Originally Justice Welch was assigned to the panel. Justice Hackett was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

[1]Although the terminology the trial court used was "not 'not guilty' findings," for clarity purposes we will use the term "judgments of non-acquittal."

1

three counts. He also argues that the trial court erred in denying his motion to suppress his un-Mirandized inculpatory statements where the statements were made involuntarily and while he was in custody. He argues that, despite the trial court's statement to the contrary, this error was not harmless because the remaining evidence was insufficient for the trial court to find him not acquitted beyond a reasonable doubt on all three counts. The defendant thus asks us to reverse the trial court's judgments of non-acquittal on all three counts or, alternatively, vacate the trial court's findings and remand for a new discharge hearing at which the defendant's statements are excluded. For the reasons that follow, we reverse the trial court's denial of the defendant's motion to suppress, vacate the trial court's judgments of non-acquittal on all three counts, and remand for a new discharge hearing at which the defendant's statements are excluded.

¶ 3                                I. BACKGROUND

¶ 4       On August 8, 2018, the defendant was charged by information with two counts of predatory criminal sexual assault of a child (PCSA) and one count of aggravated criminal sexual abuse. Count I alleged that, from about May 2018 to August 2018, the defendant committed PCSA by committing an act of sexual penetration with the minor victim, L.B., in that he placed his finger in the victim's vagina. Count II alleged that, from about May 2018 to August 2018, the defendant committed PCSA by committing an act of sexual penetration with the minor victim, L.B., in that he placed his penis in her vagina. Count III alleged that, on or about August 7, 2018, the defendant committed the offense of aggravated criminal sexual abuse by committing an act of sexual conduct with the minor victim, L.B., in that he rubbed the victim's vagina with his hand for sexual gratification.

¶ 5       On September 26, 2018, the defendant's counsel raised a *bona fide* doubt as to the defendant's fitness to stand trial. The trial court appointed Dr. Angeline Stanislaus, a board-

2

certified forensic psychiatrist, to evaluate the defendant and provide a report of her findings. On July 30, 2019, Dr. Stanislaus filed her written fitness report on the defendant. In that report, Dr. Stanislaus explained that she had interviewed the defendant, reviewed the investigative reports related to his charges, and reviewed his 2005 school graduation record. Dr. Stanislaus wrote that "it was difficult to get any reliable history [or] information from" the defendant. She observed that the defendant's hands were deformed, his facial features were indicative of fetal alcohol syndrome, and his hearing was impaired in one ear. Dr. Stanislaus questioned the defendant's "ability to truly understand the question before responding," noting that he "gave different responses each time the same question was asked." She also noted that the defendant "appeared to struggle with the concept of time." Dr. Stanislaus diagnosed the defendant with a mild to moderate intellectual disability based on his lack of adaptive functioning. Finally, Dr. Stanislaus concluded that, because of the defendant's "significant intellectual deficits," he was "unable to understand his charges and the nature of the proceedings against him." According to Dr. Stanislaus, the defendant was "unable to communicate factually with his attorney and aid in his defense," and it was "highly unlikely [that] he [would] be restored to fitness to stand trial even with treatment." Despite this, Dr. Stanislaus recommended that the defendant be sent to a "fitness restoration treatment program for those with intellectual [disabilities] *** to see if he [could] learn *** the basic nature of [the] legal proceedings against him and be restored to fitness to stand trial."

¶ 6     The State and the defendant both stipulated to Dr. Stanislaus's written fitness evaluation, and the trial court found that the defendant was presently unfit to stand trial. However, the trial court was unable to make a finding on whether there was a substantial probability that the defendant, if provided with a course of treatment, would attain fitness within one year. The trial court concluded that, "based on Dr. Stanislaus'[s] statement and opinion[,] *** it [was] worthwhile

3

sending *** [the defendant] to fitness restoration treatment." The court thus ordered that the defendant undergo fitness restoration treatment, the initial period of which would not exceed one year from the date of the court's finding. The defendant was placed for inpatient treatment in the custody of the Department of Human Services (DHS).

¶ 7    On July 31, 2020, the State filed a motion for a discharge hearing, as the most recent report from the DHS, dated June 18, 2020, had concluded that the defendant remained unfit to stand trial, and it was unlikely that the defendant would attain legal fitness prior to the expiration of the initial one-year period. On June 1, 2021, the trial court approved the appointment of Dr. Daniel Cuneo as an expert for the defendant. On October 20, 2021, the defendant filed a motion to suppress "all statements [he] made *** to law enforcement during the investigation." In this motion, the defendant argued that the statements he made to law enforcement on both August 7, 2018, and August 8, 2018, should "be barred and suppressed as evidence at his trial in that the statements were obtained in violation of his rights" under both the Illinois and United States Constitutions, and he "lacked the mental capacity" to understand, assert, or waive his rights. Specifically, the defendant argued that his August 7, 2018, statements were made while he was in custody, but he had not been Mirandized; that he had been improperly Mirandized prior to and while making his August 8, 2018, statements since he "lacked the mental capacity to have an understanding of the [*Miranda*] warnings"; and that his statements from both dates were involuntary.[2]

¶ 8                        A. Motion to Suppress Hearing

¶ 9    On September 8, 2022, the trial court held a hearing on the defendant's motion to suppress. At the hearing, Detective Scott Burge testified that he had known the defendant since around 2016, through handling some cases where the defendant was a victim of debit card theft. On August 7,

---

[2]See *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

2018, Detective Burge was called to the sheriff's office to respond to a possible sexual assault and battery. The defendant had volunteered to come to the sheriff's office and speak with officers of "his own accord." Deputy David May drove the defendant to the sheriff's office because the defendant did not have a driver's license and could not drive himself. Although the defendant's family could have come to the station "to provide statements," no one came with the defendant or on the defendant's behalf.

¶ 10    Detective Burge recalled that it was a "collective decision between [himself] and Detective Wallace" to interview the defendant at the sheriff's department "instead of trying to stand out in *** the dark" conducting the interview because the sheriff's department had "the best quality audio and video recording for the interview." The defendant entered the sheriff's office through the employee entrance, an entrance which could not be accessed by the public without permission from a Department employee. The defendant, Deputy May, Detective Wallace, and Detective Burge then walked to the interview room, a distance of around 100 feet. This was not the first time the defendant had been inside one of the department's interview rooms—during the debit card theft investigation, Detective Burge had spoken with the defendant in one of those rooms.

¶ 11    Detective Burge recalled that the defendant appeared "slovenly, dirty[,] as though he might have been working on *** a vehicle or something." The defendant was not placed in handcuffs, booked, or fingerprinted because he "was not in custody." Detective Burge "[as]sured and told [the defendant] he was free to leave multiple times." Detective Burge also informed the defendant and demonstrated that "the door was not secure." Upon arrival, the defendant stated that he had to use the restroom, so Detective Burge "walked him toward the front door, and *** showed him where the restroom was." Detective Burge waited outside as the defendant entered the restroom alone. Detective Burge and the defendant "casually talked" as they returned to the interview room.

5

Detective Burge testified that he informed the defendant that he could leave and showed the defendant that the door was not secured. Detective Burge then indicated that he had to conclude a phone call before he could interview the defendant. Detective Burge left the defendant alone in the unlocked interview room for around 30 minutes. During that time, Detective Burge periodically returned to bring the defendant food and water. He testified that at no point did the defendant give Detective Burge an indication that he did not want to speak with Detective Burge.

¶ 12    Detective Burge briefly recalled the allegations, which involved the defendant; the defendant's brother, Michael Broadway; Michael's wife, Candace; and Michael and Candace's children, the six-year-old female victim, L.B., and her slightly older brother, D.B. The defendant lived with Michael and his family. The incident of August 7, 2018, occurred in a camper on the property where the family lived. The defendant was with the children in the camper while Michael and Candace worked around the property. At some point, the defendant asked D.B. to leave the camper. The defendant then rubbed the outer portion of L.B.'s vagina over her clothing with his hand.

¶ 13    Detective Burge estimated the defendant's interview on August 7, 2018, to be about 1½ hours long. Only Detective Burge, the defendant, and Detective Wallace were in the room during the interview. Neither detective had weapons on them during the interview. Detective Burge testified that although the defendant initially seemed apprehensive, he never appeared upset or distressed. He stated that the tone of the interview was friendly rather than angry, and the interview consisted of a mix of leading and open-ended questions. The defendant at first denied any involvement in the incident, "such as even being in *** the camper." However, as the interview progressed, the defendant admitted to being in the camper, but denied the children being there with him. Detective Burge described the interview process as the defendant progressively "admitting to

6

things" that he realized the detectives already knew about. However, near the end of the interview, the defendant "finally confessed to sexually assaulting the child" on two different occasions.

¶ 14    Detective Burge believed the defendant knew he was free to leave because he mentioned that he would have to find a hotel for the night since Michael was "mad at him." Detective Burge denied any awareness of any disability impacting the defendant's level of functioning. Detective Burge testified that the defendant appeared to be of average intelligence and had indicated that he had graduated from Mt. Vernon High School in 2000. Although the defendant had "a stutter or a little bit of [a] mumble," which sometimes made his speech difficult to understand, the detectives interpreted these issues as speech irregularities rather than as signs of a disability. Detective Burge admitted that, throughout the interview, the defendant deferred to him and never tried to interrupt him.

¶ 15    Detective Burge testified that the defendant answered questions pertaining to his name, date of birth, and address, although "he had to get a piece of paper out with the physical address because *** he [lived] off and on with his brother." The defendant also knew L.B.'s name and age. He also informed Detective Burge that he was employed intermittently, had been in a romantic relationship in the past, and was on two types of medication.

¶ 16    After the interview had concluded, Detectives Burge and Wallace decided to take the defendant into custody and process him into jail. Detective Burge was unsure how much time passed between the defendant's interview and processing him. The following day, August 8, 2018, at around 6:30 p.m., Detectives Burge and Wallace conducted a second interview of the defendant. As before, neither detective was armed, and the interview was recorded. As the defendant was indisputably in custody this time, the detectives read him his *Miranda* rights off the department's standard *Miranda* waiver form. Upon being asked to read and sign the form, the defendant

7

informed Detective Burge that he could not read. Detective Burge testified that this was the first time he learned of the defendant's inability to read. Detective Burge then asked the defendant whether he understood the rights that had been read aloud to him, and the defendant confirmed that he understood.

¶ 17 Michael Broadway testified that the defendant was his brother. In August 2018, the defendant lived with Michael at Michael's house. Their other brother, Sonny, also lived with them, as well as Michael's wife and children. Michael's daughter, L.B., was 6 years old, and Michael's son, D.B., was 10. On August 7, 2018, Michael received a phone call at work and "rushed home." He described the scene at the house as chaotic. The defendant and other family members were "fighting and arguing" in the yard about "the allegations against [the defendant] messing with [L.B.]." The family's feelings toward the defendant were "pretty negative." Michael testified that he would not have given the defendant a ride to the sheriff's department or gone there on his behalf.

¶ 18 Michael testified that the defendant could drive a vehicle, drive a forklift, and help pull motors out of cars. Michael denied that the defendant required instruction or reminders on self-care tasks. To Michael's knowledge, the defendant was unemployed, although he occasionally helped Michael work on cars and scrap at Michael's automotive shop.

¶ 19 Detective Bobby Wallace testified that he was currently a detective captain at the Jefferson County sheriff's office. On the evening of August 7, 2018, Detective Wallace responded to the scene at Michael's house. Deputy David May and "at least one other deputy" were also present. Upon his arrival, Detective Wallace observed "several people," including the defendant. Detective Wallace noted that the house was in a state of "commotion," and it appeared that "a large argument or altercation" had just taken place. Detective Wallace advised the defendant that he needed to speak "with him further and asked if he would be willing to go to the Sheriff's office." The

defendant replied that he would. Since the defendant could not drive himself, and no one from the house volunteered to drive him, Detective Wallace asked the defendant whether Deputy May could drive him. The defendant agreed. Deputy May then drove the defendant to the sheriff's office.

¶ 20     Detectives Wallace and Burge conducted the defendant's August 7, 2018, interview at the sheriff's office. Detective Wallace believed the interview was approximately one hour. At least once during the interview, Detective Wallace told the defendant that he was free to leave. Detective Wallace denied having any indication that the defendant "was incapable of understanding the questions" asked of him. The defendant's answers seemed appropriate in response to the questions asked. The defendant's "deceptive" answers at the beginning of the interview, wherein he disagreed with the officers and denied the allegations against him, were similar to Detective Wallace's experiences with previous suspects in "hundreds" of past interviews.

¶ 21     On cross-examination, Detective Wallace admitted that, other than the defendant's denials at the beginning of the interview, the defendant seemed to agree with "certain facts presented" by the detectives. Detective Wallace explained that, "when confronted with facts that [the detectives believed] he knew to be true," the defendant would "change his lie to more admit to some part of the question that [they] were asking him." Detective Wallace did not deny, however, that the defendant seemed to "defer to [their] authority" during the interview. Detective Wallace confirmed that the facts the detectives believed to be true were taken from statements by the victim and her family.

¶ 22     Dr. Daniel Cuneo, an expert in the field of forensic psychology, testified that he held an Illinois sex offender management board certification, and had been qualified as an expert witness in the field of forensic psychology in Illinois courts over 2,500 times. Since approximately 1980,

he had conducted evaluations of a defendant's ability to understand his or her *Miranda* rights around one to two times per month.

¶ 23    Dr. Cuneo testified that he had evaluated the defendant and submitted his report. Before evaluating the defendant, Dr. Cuneo reviewed the defendant's records from the mental health center, two video recordings of the defendant's August 2018 interviews with police, and the defendant's prior testing, including an Intelligence Scale test. This test found that the defendant had a full-scale intelligence quotient (IQ) of 46 and was unfit to stand trial. A reading subtest indicated that the defendant was illiterate. Dr. Cuneo diagnosed the defendant with a moderate intellectual disability, determined that he functioned at the cognitive level of a seven-year-old, and concluded that he read at roughly a preschool-kindergarten level. Dr. Cuneo commented that the defendant's illiteracy was to the extent that he "could not identify all of the letters of the alphabet" or "read such simple words as 'cat.' " Dr. Cuneo's opinion was, "if he can't do that, he can't read the *Miranda*; [h]e can't understand the *Miranda*; and if he signs it, he has no idea what he's signed." Dr. Cuneo concluded, "In this case, there was no way this gentleman could understand his *Miranda* rights."

¶ 24    Dr. Cuneo testified that, in his professional opinion, the defendant did not have the "abstract ability to understand what a right [was]" or to knowingly waive his rights. In fact, the defendant could not reason on an abstract level at all. The defendant could communicate "like a six or seven-year-old," and could "get on a riding lawn mower and cut the grass," but he would be unable to "hold down a menial job," handle his own disability funds, or understand his right to counsel. Dr. Cuneo recalled reading the defendant the *Miranda* rights and asking the defendant to explain each one back to him. The defendant was unable to do so. Dr. Cuneo explained that intellectually disabled individuals were generally "quick to acquiesce" to authority figures when

10

they did not understand questions. However, if asked to explain in their own words what they purportedly understood, intellectually disabled individuals would be unable to do so. Dr. Cuneo concluded that, because of the defendant's significant intellectual deficits, including his inability to reason on an abstract level, the defendant would never become fit to stand trial, even with treatment.

¶ 25 Dr. Cuneo explained that although the defendant understood verbal concepts better than written concepts, he still only functioned "at best at an eight-year-old level." Dr. Cuneo acknowledged that an eight-year-old could "tell you no," could verbalize "whether or not he *** [wanted] to answer a question," and could verbalize "whether he [wanted] to leave or not," although Dr. Cuneo conditioned the last on the eight-year-old's understanding of the specific situation.

¶ 26 On cross-examination, Dr. Cuneo admitted that he never asked the defendant whether he felt free to leave during the police interviews. Dr. Cuneo acknowledged that the defendant "understood why he was at the Sheriff's Department" and "knew he was in trouble." Dr. Cuneo maintained that the defendant would not have left "because he was told to stay there by somebody in authority." Dr. Cuneo was "not sure anybody told" the defendant to stay in the room, and admitted that the defendant "was told numerous times that he could, in fact, leave."

¶ 27 Dr. Cuneo testified that "an individual who was intellectually limited [would] acquiesce"; and that "[y]ou [could] eventually get them to say pretty much anything." Dr. Cuneo acknowledged that, during the police interviews, the defendant gave narrative answers and denied for about 40 minutes what the officers were accusing him of, "even when they confronted him." Dr. Cuneo acknowledged that the defendant's behavior may not have been very different from that of a functioning adult but insisted that "his thought processes" would have been. Dr. Cuneo

11

concluded that: "If you had a thousand people there, 999 people would be brighter than" the defendant. At the conclusion of the evidence, the State stipulated to the defendant's motion to suppress regarding his August 8, 2018, statements.

¶ 28 On November 9, 2022, the trial court issued a written order denying the defendant's motion to suppress regarding his August 7, 2018, statements, finding that the interrogation "was plainly an out-of-custody interview." Among other things, the trial court found that, although the defendant was "clearly low functioning intellectually," the August 7, 2018, video did not show that the defendant "involuntarily [incriminated] himself," or that he was in any way "led or cajoled into his inculpatory statements." The trial court concluded that, despite the defendant's limited intellectual ability, the State nevertheless met its burden of proof to show that the defendant's statements during the August 7, 2018, interrogation were knowing, intelligent, and voluntary, and not violative of the defendant's rights.

¶ 29                                    B. Discharge Hearing

¶ 30 On April 20, 2023, the trial court held a discharge hearing under section 104-25 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-25 (West 2022)). As the disposition of this case is resolved by the denial of a motion to suppress the defendant's statements, the statement of facts as to the discharge hearing shall be restricted to matters concerning that issue only.

¶ 31 Detective Wallace testified at this hearing as he had previously at the suppression hearing, as set forth above. After reporting to the scene, he returned to the sheriff's office and met with Detective Burge. The two detectives proceeded into the interview room with the defendant. Detective Wallace described the interview room where the defendant's first interview took place as "a narrow room." It was approximately eight feet wide with "a little angle toward the back"

12

where it narrowed down to about six feet wide. The defendant's interview was video recorded. The State and the defendant agreed to redact approximately 40 to 50 minutes of the defendant sitting in the room by himself prior to the interview. The trial court admitted the final redacted version of the recording into evidence over defense counsel's objection that was previously made in the motion to suppress. The redacted 58-minute video recording of the defendant's August 7, 2018, police interview was then played in its entirety for the court.

¶ 32    In the video, the two detectives entered the room and sat in chairs opposite the defendant. As soon as the detectives entered, the defendant put his hands on the back of his head. Detective Captain Burge commented, "You see, that door's not shut all the way. I told you a hundred times, didn't I?" The defendant looked at the door and nodded. "Okay," said Detective Burge. "I wanted you to know that, [it is] not shut all the way." Detective Burge then introduced the defendant to Detective Wallace, and the detectives made a bit of small talk with him before Detective Burge stated that it was 9 p.m. on August 7, 2018. Detective Burge's voice was loud, but his tone throughout the interview was generally conversational. The defendant often laughed and joked with the detectives. The defendant exhibited a pronounced stutter and often mumbled incomprehensibly, which often made the defendant's speech extremely difficult to understand.

¶ 33    Detective Burge asked the defendant his middle name. The defendant thought for a few seconds and responded that it was "William." The defendant stated that his birthdate was October 17, 1985, and that he was 32 years old. When asked what Mike's address was, the defendant stated that the address on his identification card (ID) was still his ex-girlfriend's address. He then pulled from his wallet a piece of paper with Mike's address on it and showed the paper to Detective Burge. Detective Burge recalled that the defendant had been to the sheriff's department before for an incident involving "what's that guy and his wife *** about [the defendant's] debit card, [where]

13

she would take [the defendant's] card." The defendant did not have a working cell phone. Detective Burge asked the defendant where he had gone to school. The defendant responded that he had graduated from Mt. Vernon High School in 2005, but was unable to clearly answer where he had gone to grade school and commented that he tended to "move around." Detective Burge commented that he had noticed that the defendant moved around like he "changed [his] clothes."

¶ 34    Detective Burge asked the defendant how long he had been with Mike and Candace and commented that the situation was "wild." The defendant agreed, commenting: "wild, yeah, kicking me out." Detective Burge and the defendant then proceeded to joke together about how Mike tended to be "grouchy." Detective Burge asked how many kids Mike had. The defendant answered, "five." The defendant did not know how old the children were, but knew they were grade school age. The defendant was currently unemployed but explained that he used to work as a "scrapper." The defendant told the detectives that he had lived with Mike for the past three months.

¶ 35    Detective Burge asked the defendant: "when you came up here today, you came up here on your own, didn't you?" The defendant answered, "Yeah!" Detective Burge continued, "on your own free will, you decided to come on up?" The defendant responded, "Yeah." Detective Burge asked: "Well you met Bobby out there, didn't you?" The defendant looked at Detective Wallace and chuckled, "Yeah!" Detective Burge continued: "And you said you came up on your own free will to talk to us?" The defendant answered, "Yeah, I always…" Detective Burge confirmed once again: "They didn't make you come up here?" The defendant answered, "no," and shook his head while laughing. Detective Burge concluded: "Okay, well I didn't, I didn't mean—I just wanted to make sure!" The defendant continued to laugh. Detective Burge confirmed once more: "I just want to make sure, you said you'd come up here to talk to us?" The defendant again answered, "yeah."

14

¶ 36    Detective Burge told the defendant he had been called to come talk to the defendant about a matter involving Mike's daughter. The defendant volunteered L.B.'s name and age. Detective Burge asked the defendant what was going on. The defendant answered: "Not me… I told… I'm outside." Detective Burge responded, "You're outside?" The defendant continued: "No. I'm upstairs, I'm taking a nap. *** I'm sleeping, and he woke me up. *** Sonny [woke] me up… a problem, man… threaten me, and hit me… you can't do that." Detective Burge clarified, "Your brother Sonny?" The defendant said, "No." Detective Burge asked, "Oh, Mike. Mike?" The defendant responded, "Threaten me." Detective Burge asked, "What for?" The defendant responded, "Oh, messing with… his daughter. I didn't mess with her!" The defendant then said something unintelligible, which Detective Burge seemed to understand. In response, Detective Burge said, "We're not talking about that, dude!"

¶ 37    Detective Burge asked the defendant if he stayed in the camper or the house. The defendant said he stayed in the house, and that the camper was "Mo's." Detective Burge asked, "So what in the world are they talking about? So were you playing with the kids out in the camper or something?" The defendant denied that he was in the camper and said that he was "upstairs taking a nap." Detective Burge asked if he was upstairs in the house or in the camper. The defendant responded that he was upstairs in the house. Detective Burge redirected the conversation: "No, I want to know about the camper. So were you out there playing with the kids or something?" The defendant vigorously shook his head from side to side, and said, "No, no. *** I'm upstairs, taking a nap." When asked what time this was, the defendant had to think for a bit, but eventually answered, "Around…6. *** Woke me up, started on me, 'messing with young kids,' they threatened me." Detective Burge asked what the defendant had done that day, and the defendant answered that he had slept all day. The defendant was asked if he was on any medication, and he

15

responded that he was on seizure medication and anxiety pills. He did not know what the pills were called, but told the detectives that they were blue, and confirmed that they made him tired. The defendant told the detectives that he had an ear infection and could not hear out of that ear, but denied that he was taking any antibiotics.

¶ 38     Detective Burge again asked the defendant whether he was "out playing in the camper with the kids," and the defendant again denied this. The defendant knew D.B.'s name, and that he was older than L.B., but did not know his exact age. The defendant insisted that he was taking a nap. Detective Burge said: "No, I'm talking now in the camper… I'm talking in the camper, earlier today. *** You was out in the camper with them, right?" The defendant immediately denied this. Detective Burge then said, "I thought you ain't going to lie to me! *** I already know you was out in the camper with them." The defendant said: "No, no… the camper… I ain't messed with them." Detective Burge said, "Well, I'm not even asking you that, but you was out there in the camper with them, right? What time was that, probably?" The defendant thought for a while, and eventually answered: "Probably, past noon." The defendant confirmed he had woken up from his nap at 6 p.m., and thought he had gone to lie down at 2 p.m. The defendant affirmed Detective Burge's assertion that he therefore must have been in the camper between noon and 2 p.m.

¶ 39     The defendant told the detectives that he was watching the kids in the camper while they were playing. The defendant and Detective Burge then engaged in some friendly small talk about the scrapping business. Eventually, Detective Burge redirected the conversation back to the children in the camper. The defendant seemed hesitant. Detective Burge told him, "Come on man, how you gon' lie to me… I know you was already in the camper, so tell me about what's going on. Mike's mad at you for some reason, so you gotta tell me what's going on, man." Detective Burge asked the defendant what caused Mike to "come up there and wake [him] up about the kids

16

or whatever." The defendant said that somebody had told Mike and Candace that he had "messed with [L.B.]." The defendant did not know who had told them, but then agreed that it was D.B. The defendant did not know why D.B. had accused him. Detective Burge then asked: "What do you mean 'you messed with them,' what does that mean?" The defendant said it meant "child molester, all that." Detective Burge asked: "well, did you do something, and you think they thought it was, cause they're kids, you know what I'm talking about?" The defendant denied this and maintained that he had not "messed with them." The defendant told Detective Burge that Ronnie Broadway, his cousin who was a sex offender, was living at the house with the family. Detective Burge acknowledged that he had not known that.

¶ 40    Detective Burge asked the defendant what was going on in the camper when he was in there with L.B. At first, the defendant said, "nothing," but then, when asked whether they had perhaps been playing a game, said, "yeah, playing, yeah, driving, let her driving." The defendant said that D.B. was lying down on the bed and play-driving as well. The defendant told Detective Burge that he had been in the camper with the kids for about two hours. Detective Burge asked the defendant what exactly Mike had accused him of. The defendant responded, "playing with herself, and stuff," and made a guitar-strumming motion in front of his genital area. Detective Burge clarified, "oh, rubbing like her private parts and stuff like that? What do you call that?" The defendant responded, "that means… playing… but it ain't! I ain't…" The defendant touched his inner thigh to demonstrate where on the child Mike had accused him of touching. Detective Burge asked the defendant what he would call that, and the defendant responded unintelligibly. Although this court cannot understand what the defendant said, Detective Burge seemed to understand, and responded, "No, no, no, no," in a disappointed tone. Detective Burge again asked what the defendant would call that part "on a woman," and the defendant responded, "vagina," and

17

chuckled. Detective Burge clarified: "He said you were using your hand on… rubbing her vagina?" The defendant said, "yeah, yeah," and "man, I didn't… man, no! I didn't messed with her!" The defendant put out his hand and shook his head as though the idea was ridiculous. Detective Burge continued: "Well were you guys doing something, maybe *** the kids thought that?" "Yeah, yeah," the defendant responded. Detective Burge asked: "What was going on, what were you doing? I don't know, dude." The defendant responded, "Me, neither," and laughed. The defendant told Detective Burge that L.B. was wearing a T-shirt and a skirt with shorts underneath.

¶ 41     After some unrelated small talk, Detective Burge redirected the conversation back to what the defendant might have been doing that the children may have misinterpreted: "There must have been something that the kids thought was going on… were you rubbing her legs or something, I guess the kids thought something different?" The defendant vigorously shook his head and said, "No." Detective Burge said, "You told me you weren't going to lie to me, dude, now, come on…" At this, the defendant laughed and smiled. Detective Burge continued: "Don't tell me lies now, okay, because I'm not lying to you. So the little girl said this happened, but like, it's a little kid, you know what I mean? *** So you got the little girl telling me something, then I got the little boy that's telling me something… that's the same, you know what I mean? So they're, they're, matching. *** But I need you to tell me what really happened. *** Can you do that for me?" Detective Burge suggested that perhaps the defendant had made "a mistake," but the defendant immediately denied this. Detective Burge then suggested that "some kind of accident" had occurred where the defendant was "reaching over and accidentally touched something." The defendant immediately adopted this explanation, miming reaching over for something, accidentally touching something else, and crying out, "woah!" Detective Burge confirmed: "So you just accidentally reached and touched her vagina, is that what you did? In the car, there?" The

18

defendant answered affirmatively: "Yeah, and she may have… [incomprehensible] 'stay away!' " The defendant then told the detectives that the child had her clothes on, that he only touched her vagina, and that he only touched it with his hands.

¶ 42 The detectives asked the defendant whether he "actually [rubbed] on [the child's vagina], by accident." The defendant answered: "Yeah, little bit, and I might have… backed away." The detectives asked the defendant where he was in the camper when this happened. The defendant maintained that he was "up front" until Detective Burge said:

> "You told me you was going to tell me the truth, man. These kids already told me what's going on. *** Just tell me what happened. Come on, man, I know you a long time. *** You know, something happened, maybe it was an accident, you know what, but I need to know everything, whether or not you meant to do that or not, or just went like 'woah,' and 'I figured it out, I need to not do that,' that's one thing, but I have to know, otherwise it looks like you're lying to me. *** I'm not mad at you, you know what I mean?"

While Detective Burge was saying this, the defendant smiled and nodded along, interspersing in words of agreement with the suggestion that what had occurred was a misunderstanding and an accident.

¶ 43 The defendant then stood up from his chair to physically demonstrate how the "accident" had occurred. He explained that he had been standing in the camper with L.B. standing behind him. He demonstrated backing up without looking behind him, and mimed how, in the process, his hand had inadvertently touched L.B.'s vagina. Detective Burge responded: "Now you told me you was going to tell me the truth." The defendant sat back down and laughed. Detective Burge told the defendant that he already knew the defendant tried to "make the boy get out." The defendant insisted that he was telling the truth. Detective Burge said, "I'm not mad at you, buddy. I just need to know what happened. *** I know you had her sitting on the bed, right?" The defendant acquiesced, admitting that to be the case. Detective Burge asked the defendant whether

19

he had rubbed on L.B.'s vagina, whether it was under her skirt, or whether he had L.B. rub him. The defendant denied each of these possibilities.

¶ 44    In response, Detective Burge again expressed disappointment because the defendant had said that he "wasn't going to lie," and told the defendant that he "already [knew]" the truth. He expressed that he was not "mad at" the defendant, because he knew the defendant had learned not to do this again, but that the defendant needed to tell the whole truth before that could happen. He also assured the defendant that nothing could "embarrass" him because the detectives heard "stuff all day long." The defendant laughed. The defendant then confirmed that he had L.B. sit on the bed, but denied having D.B. leave the camper, and instead told the detectives that he left before D.B., and that he went to take a nap upstairs in the house. Detective Burge asked the defendant if he "had [his] penis out at any time." The defendant vigorously shook his head from side to side and denied this. Detective Burge asked the defendant why both children were telling him otherwise. The defendant said that he did not know, and Detective Burge again asked the defendant to tell him the truth. Detective Burge pointed out that he was not "calling [the defendant] names or nothing like that."

¶ 45    Detective Burge offered up an alternate theory that perhaps the defendant had been trying to use the bathroom when L.B. touched his penis. The defendant maintained that he had not had his penis out in the camper. Detective Burge informed the defendant that officers would check the camper and L.B.'s clothing, and asked if they would find his semen in the camper or on her clothing. The defendant was confident that they would not. The defendant continued to deny having his penis out in the camper. However, the defendant did admit that he had rubbed on L.B.'s vagina in a way that was not accidental for around a "couple minutes." After the defendant admitted this, Detective Burge told the defendant that he knew the defendant had his penis out,

20

"maybe not today," but before. Detective Burge asked the defendant how many times he had his penis out before. The defendant denied this. Detective Burge responded, "dude, come on," and stated that the children could not and would not lie. Detective Burge warned the defendant that he would know the defendant had been lying when he got the chance to speak with L.B., and she told him something different, and that, after that happened, Detective Burge would have to "get all mean" even though he did not want to. The defendant continued to deny ever having his penis out, but admitted to the "mistake" of touching L.B.'s vagina once in the camper.

¶ 46   Detective Wallace told the defendant that he had spoken with L.B. and knew that there had been "at least one other time" that the defendant had touched her vagina. Detective Wallace told the defendant that he did not think the defendant meant to hurt the child, but that he could not be sure without more information as he had just met the defendant that day, unlike Detective Burge, who had known the defendant "a long time." At this point, Detective Burge stated that there was a difference between a person that was "trying to be mean and beat her up and forcibly do that" and a person that "did it by mistake a couple times." Detective Burge expressed his belief that the defendant fit into the latter category, but that he needed more details. The defendant, however, continued to deny that there had been any other occasions of abuse other than the camper incident.

¶ 47   Detective Burge asked if the defendant had "put [his] finger inside of [L.B.]." The defendant shook his head and said, "no." Detective Burge then traced the defendant's hand on a sheet of paper and said: "I'm not saying you put your whole hand inside her vagina. You know, that's what somebody mean would do." Detective Burge asked the defendant to mark how much of his finger went inside her vagina. The defendant maintained that he had not put his finger inside L.B.'s vagina in the camper, and Detective Wallace clarified that they were asking about times prior to the camper incident. The defendant chuckled, adjusted his cap, and, after some

21

encouragement by the detectives, marked the tip of the index finger. The defendant agreed that he had inserted the marked tip of the index finger into L.B.'s vagina at the house, sometime prior to the camper incident. The defendant did not know how long ago this was, and Detective Burge said it could not have been that long ago, since the defendant had said he had been at the house for the past three months. At this point, the defendant interjected, "three years." Detective Burge asked if the insertion had perhaps happened "a month ago," and the defendant agreed. The detectives thanked the defendant for "not lying."

¶ 48    The detectives then asked the defendant to tell them "about the time [he] had [his] penis in her, because she [had] told [them] all about that." When asked how much of his penis he had put inside L.B., the defendant answered, "none." Detective Burge again expressed disappointment because he "thought [the defendant] was going to tell [them] the whole truth." Detective Wallace asked the defendant: "Well, when was that? When would she talk about your penis? Because she calls it 'the dude,' right?" The defendant chuckled. Detective Wallace then recounted how L.B. had told them about the penis "spitting." Detective Burge asked the defendant what he thought L.B. meant by "spitting." The defendant laughed, seemed embarrassed, and responded that he did not know. The detectives told the defendant that he was "not in any more trouble," that they were "not mad at [him] or anything," and that they were trying to make him "understand that" they were attempting to help him. Detective Burge asked if the defendant had put "like, the tip of [his penis] in" L.B.'s vagina. The defendant said, "yeah," and confirmed that he called that area of his penis "the tip." The defendant maintained that this had not occurred during the camper incident but had happened during a "time before."

¶ 49    After further questioning by the detectives, the defendant admitted that he had put semen inside of L.B.'s vagina, but called it an "accident" and a "mistake." The defendant remained

22

adamant that this had not happened in the camper but only during a "time before" in L.B.'s bedroom at night. The defendant estimated that this "time before" happened a couple months prior, and denied holding L.B. down or telling L.B. to remain secretive. The defendant did admit, however, that L.B. had told him that it hurt when he put his penis inside her, and that L.B. told him to stop. The defendant told the detectives that L.B. had underwear and a nightgown on, and when asked whether he "[pulled] it to the side or [took] them off," he responded, "nope." Detective Burge asked, "Which one?" The defendant referred to his original excuse for the camper incident at this point, saying that he had just "bumped into her." Detective Burge redirected the conversation: "No, I'm talking about when she was in the bed when you put your penis in her vagina." The defendant responded, "underwear," and explained that he had pulled L.B.'s nightgown down. The defendant remained adamant that he had left L.B.'s clothes on when he rubbed her vagina in the camper earlier that day.

¶ 50    At this point, around 50 minutes into the interrogation, the defendant mentioned feeling thirsty, and the detectives paused the interview to get him some water. While Detective Wallace was out of the room, Detective Burge opened an envelope containing gloves and a tester inside, and assured the defendant that he had "to do this all the time, for everybody." Detective Burge and the defendant laughed and joked around while Detective Burge prepared the test. The defendant informed Detective Burge that he had a toothache, and Detective Burge told him that he would be doing the test on himself. Detective Burge told the defendant to take the Q-Tips and swab his cheeks. The defendant complied and then drank the bottle of water Detective Wallace had brought for him. As Detective Burge sealed up the test, he asked the defendant what had happened to the individuals involved in his earlier debit card case. Detective Burge recalled their names and where they used to live, and the defendant updated him on where they lived now. The detectives asked

the defendant if he was "cool to sit in here for a few minutes" while the detectives made a few phone calls. The detectives left the room, and the defendant got up to "use the bathroom." At this point, the recording ended.

¶ 51     The trial court then admitted into evidence, over defense counsel's objection, a copy of the hand diagram that the defendant used during his interview to measure the finger length he inserted into L.B.'s vagina. The trial court also admitted the Illinois State Police laboratory report concerning the results of the DNA testing of the sexual assault kit undertaken by L.B. at Cardinal Glennon Hospital on August 7, 2018. This report stated that tests "did not detect any male DNA" in external genital swabs taken from L.B.

¶ 52     On cross-examination, Detective Wallace admitted that, during the redacted portion of the defendant's August 7, 2018, interview, the defendant was recorded speaking to himself while he was waiting alone in the interview room. Specifically, the defendant "made a comment that, 'I ain't messed with her.' " On redirect examination, Detective Wallace clarified that he had not expected any DNA evidence from the rape kit "that would be similar to semen" because, not only had the defendant "adamantly refused" having his penis out in the camper, but there was no other evidence that suggested that he had his penis out in the camper. The trial court subsequently took judicial notice of Dr. Cuneo's testimony from the motion to suppress hearing, as well as of Dr. Cuneo's fitness report on the defendant. The trial court took a recess and continued the rest of the discharge hearing to May 18, 2023.

¶ 53     On May 18, 2023, the discharge hearing recommenced. Final arguments were presented, after which the trial court made its final oral ruling:

> "First off, I believe the State has proved its case beyond a reasonable doubt in each and every Count, there being three Counts. I believe that the—first off, the interview that I viewed of the child, I found the child to be perfectly credible, as well as her testimony some years later. I'm not an expert on children, but I've been around them, and I have

24

raised some. So I believe her—the evidence that she gave was very credible. The evidence that was given concerning the incident, as well, I found to be credible. And the interview of Mr. Broadway, I believe that—as I found in my Order on the Motion to Suppress when I denied the Motion to Suppress, I believe that he was aware that he had done something wrong, that he was in trouble, and that he was not forced to admit anything. However, I would say that the State has made its case without his statement. I mean, I felt that the State's case was strong enough that it would have survived without presenting his statement.

So I do find that the defendant is, under the statute 730 [*sic*] ILCS 5/104-25, that he is not not guilty, and then, I guess, at this point, the Court would give him his appeal rights."

¶ 54 Later that same day, the trial court issued its written order upon conclusion of discharge hearing with provisions for acquittal or extended treatment. The trial court found the defendant not "not guilty" based on a standard of proof beyond a reasonable doubt. The court found that the extended term of treatment had expired, and that the matter should be set for a hearing under section 104-25(g) of the Code (725 ILCS 5/104-25(g) (West 2022)). The current treatment order was continued.

¶ 55 Also that same day, the defendant filed a motion to vacate the trial court's findings and grant a new discharge hearing. The defendant argued that the State did not present sufficient evidence to prove him not "not guilty" of the charged conduct beyond a reasonable doubt, and that the trial court's finding him not "not guilty" of all three counts was thus "contrary to the manifest weight of the evidence." The defendant also argued that the trial court had erred in overruling his objection concerning the admission and publication of the video of the defendant's August 7, 2018, interview with police.

¶ 56 On July 20, 2023, the trial court denied the defendant's motion; found that the defendant remained unfit to stand trial; found that the defendant posed "a high threat to public safety"; and sentenced the defendant to "the maximum amount of time that [he] could spend in custody," 127

25

years. The court clarified that DHS or the state's attorney's office could "bring it to the court's attention if they [thought] he [needed] to be released sooner."

¶ 57 On July 20, 2023, the trial court issued its written order upon hearing at the expiration of the extended period of treatment. The trial court ordered that the defendant be placed in a secure setting by the DHS for a term of treatment set to expire on August 7, 2150, a term of approximately 127 years, which was "equal to or less than the maximum sentence to which the defendant would have been subject had he *** been convicted in a criminal proceeding." Periodic treatment plan review hearings would be held every 180 days after the defendant was remanded to DHS, for so long as the defendant was confined and treated under the order.

¶ 58 On July 21, 2023, the defendant filed a notice of appeal.

¶ 59                                II. ANALYSIS

¶ 60 On appeal, the defendant argues that this court should reverse the trial court's judgments of non-acquittal on all three counts due to insufficiency of the evidence. Alternatively, the defendant asks us to vacate the trial court's judgments and remand for a new discharge hearing because the trial court erred in denying his motion to suppress his August 7, 2018, inculpatory statements to police.

¶ 61 We will first address the defendant's claim that the trial court erred in denying his motion to suppress, resulting in error that was not harmless, and requiring that the judgments of non-acquittal be vacated and a new discharge hearing be held in the trial court.

¶ 62                          A. Denial of Motion to Suppress

¶ 63 A court of review will accord great deference to the trial court's factual findings and credibility determinations, and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Specifically, a trial court's

26

finding on the question of custody is a question of fact and will not be disturbed on appeal unless that finding is against the manifest weight of the evidence. See *People v. Willoughby*, 250 Ill. App. 3d 699, 717 (1993); *People v. Wheeler*, 281 Ill. App. 3d 447, 458 (1996). Also, "in reviewing whether [the defendant's] confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review *de novo* the ultimate question of whether the confession was voluntary." *In re. G.O.*, 191 Ill. 2d 37, 50 (2000); see also *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996). However, the court will review *de novo* the ultimate question posed by the legal challenge to a trial court's ruling on a motion to suppress. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). On appeal, the defendant argues that the trial court erred in denying his motion to suppress his inculpatory statements where the statements were made involuntarily and while he was in custody.

¶ 64                    1. *Determination that interview was custodial*

¶ 65    The defendant first argues that his inculpatory statements were made while he was in custody, and that since he was not Mirandized, the statements should have been suppressed prior to his discharge hearing. It is well settled that a person subjected to a custodial interrogation "must be warned prior to any questioning" of certain rights. See *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Only after a defendant's *Miranda* warnings have been given can a defendant "knowingly and intelligently waive [his] rights and agree to answer questions or make a statement." *Id.* Without a proper *Miranda* waiver, no evidence obtained through custodial interrogation may be used against a defendant at trial. See *id.* Here, it is undisputed that the defendant was interrogated on August 7, 2018, and that he was not given *Miranda* warnings. The question, then, is whether the trial court erred in determining that the defendant's interrogation was not custodial.

27

¶ 66    In determining whether a person was in custody for purposes of *Miranda*, a court should first examine the circumstances surrounding the interrogation. The following factors have been found relevant in determining whether a defendant was in custody: location, time, length, mood, and mode of the interrogation; number of police officers present; presence or absence of defendant's family and friends; indicia of formal arrest; and age, intelligence, and mental makeup of defendant. *Braggs*, 209 Ill. 2d at 506. Additionally, if an officer's beliefs of an individual's guilt are conveyed by word or deed to the individual, such beliefs may also bear upon the custody issue to the extent that they affect how a reasonable person in the individual's position would view his freedom of action. *Slater*, 228 Ill. 2d at 153. After examining the circumstances surrounding the interrogation, the trial court must use the applicable reasonable person standard to determine whether the defendant was in custody. The usual applicable standard is whether, based on the circumstances, a reasonable person, innocent of any crime, would have felt he was not at liberty to terminate the interrogation and leave. *Braggs*, 209 Ill. 2d at 506. However, the defendant argues that, rather than this usual standard, the modified reasonable person standard outlined by our supreme court in *Braggs*, 209 Ill. 2d 492, applies to his case.

¶ 67    In *Braggs*, defendant was charged with the first degree murders of two individuals, deemed unfit to stand trial, and found "not competent to waive her *Miranda* rights." *Braggs*, 209 Ill. 2d at 495. Defendant had an IQ of 54 and lived with her sister, who acted as her guardian. Defendant's sister gave consent for defendant to be interviewed, and defendant was interviewed a total of six times. On every occasion when defendant was questioned outside her home, the police transported defendant and her sister. *Id.* at 511. Two detectives were always present during the interrogations. *Id.* The interviewing detective admitted that defendant's mental deficiencies were apparent and that defendant's sister had admonished the detective that defendant was "mentally incompetent"

prior to any questioning. *Id.* at 496. At the final interview, the detective read defendant her *Miranda* rights. Defendant's sister cursorily explained these rights to defendant, who nodded affirmatively but did not sign a waiver form. During this interview, which the trial court found to be non-custodial, defendant admitted to killing both victims and was formally arrested. Subsequently, five psychiatrists diagnosed defendant with "moderate mental retardation" and determined that defendant was unfit to stand trial. *Id.* at 500. A psychiatrist testified that defendant was "not capable of abstract thinking" and could not understand or explain the meaning of her *Miranda* rights. *Id.* at 500-02. A psychologist testified that "defendant functioned, mathematically, at a kindergarten level *** [and] could not read or write." *Id.* at 501. That same psychologist stated that the defendant did "not tolerate stress very well and [was] 'suggestible.' " *Id.* at 502. The psychologist "described more than one instance where she was able to lead defendant in the questioning to get the information desired." *Id.*

¶ 68 On appeal, our supreme court found that a modified reasonable person standard applied in determining defendant's custodial status. Our supreme court determined that the standard to be applied in *Braggs* was if "a reasonable person with defendant's mental capacity would have believed he or she was in custody and not free to leave the police station." *Id.* at 512. Our supreme court concluded that the circumstances surrounding defendant's impaired intelligence alone may not be sufficient to justify the application of this modified reasonable person standard. A substantial factor was that the investigating officers knew of defendant's mental deficiencies and "knowingly exploited" them. *Id.* at 513.

¶ 69 In this case, the defendant's limited and impaired intelligence has been convincingly demonstrated. As in *Braggs*, the defendant was diagnosed with an intellectual disability and deemed unfit to stand trial. The defendant was found to have a full-scale IQ of 46, a score eight

29

points lower than the defendant in *Braggs*. Psychiatrist Dr. Stanislaus immediately noticed physical features suggesting impairment. Testifying psychologist Dr. Cuneo determined that the defendant functioned at the cognitive and communicative level of a seven-year-old, was illiterate to the extent that he "could not identify all of the letters of the alphabet" or "read such simple words as 'cat,' " and lacked the mental capacity to understand, assert, or waive his *Miranda* rights. As with the defendant in *Braggs*, it was Dr. Cuneo's professional opinion that the defendant did not have the ability to reason on an abstract level at all, let alone the "abstract ability to understand what a right [was]." Dr. Cuneo also testified that intellectually disabled individuals like the defendant were generally "quick to acquiesce" to authority figures when they did not understand questions asked of them, and that "[y]ou [could] eventually get them to say pretty much anything." Dr. Cuneo summarized the defendant's intellectual capabilities by commenting that: "If you had a thousand people there, 999 people would be brighter than" the defendant.

¶ 70    Additionally, the detectives knew the defendant's mental limitations and exploited them in questioning. Exploitation does not necessarily suggest or require a malicious intent. It implies that known or observable limitations in defendant's mental capabilities serve as opportunities to elicit statements of culpability.

¶ 71    In *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), the Supreme Court clarified the exploitation factor as pertaining to a child's age. In *J.D.B.*, the 13-year-old defendant was questioned by police without *Miranda* warnings and eventually confessed to the crime. The defendant challenged the admissibility of this confession, claiming that it had been custodial. The Supreme Court found that interviewing officers did not have to subjectively know the defendant's age for that to inform the custody analysis—it was enough if the defendant's age "would have been objectively apparent to any reasonable officer." *Id.* at 274.

30

¶ 72    Similarly, we find that it is enough to justify application of the modified *Braggs* reasonable person standard to a custody analysis, if any reasonable officer would have known of the defendant's intellectual disability. However, in this case, after careful review of the evidence, including our own review of the video recording of the defendant's interview, it is our opinion that the defendant's intellectual disability was, or should have been, recognized by the interviewing detectives.

¶ 73    Detective Burge had known the defendant since approximately two years prior to the interview, through handling some cases where the defendant had been a victim of debit card theft. Detective Burge was able to recall specific details about one such theft during the interview, including that he had spoken with the defendant about the incident at the station. A detective also demonstrated some knowledge of defendant's family. During the interview, the detectives often spoke to, and treated, the defendant as not fully an adult but as a child or a person of low intelligence. Instances include detectives telling the defendant that, "I'm not mad at you, buddy," that putting his whole hand into the child's vagina was something "somebody mean would do," and several times saying something similar to, "Come on man, now you gon' lie to me *** You told me you was going to tell me the truth, man." Other telling factors include the nature and manner of his limited response, and his overall demeanor. It appears that the defendant was led by suggested theories and ultimately acquiesced to the detectives' suggestions. Much of this can be seen as a predictable consequence of his mental impairments as testified to by the psychological experts.

¶ 74    We also find that it was against the manifest weight of the evidence for the trial court to determine that the officers did not recognize and to some extent exploit the defendant's intellectual limitations. We find that the appropriate standard to apply in determining whether the defendant

31

was in custody for purposes of *Miranda*, and for a determination of whether the defendant felt he was at liberty to terminate the conversation and leave, was the modified reasonable person standard outlined in *Braggs*.

¶ 75    Additionally, the circumstances and location of the interrogation favors a finding that the defendant was in custody, as a reasonable person with the defendant's mental capacity would not have believed he were free to leave. The defendant "was brought to the sheriff's office, an official setting that has been held to be inherently coercive." *People v. Alfaro*, 386 Ill. App. 3d 271, 294 (2008). The defendant was escorted inside the sheriff's office through an entrance that members of the public could not normally walk through without permission from somebody from the department. As the defendant was unable to drive and his family members refused to transport him, he "was dependent upon the police to provide him with a way to leave the sheriff's office." *Id.* The time of the questioning began at 9 p.m. on the night of the incident. The tone of the interview was often accusatory. Detectives repeatedly communicated to the defendant their belief that the defendant was lying about sexually assaulting L.B. While the subjective beliefs of police are generally irrelevant, they may become relevant when communicated to the defendant. *Braggs*, 209 Ill. 2d at 506-07. Despite the detectives' cordial manner, "we conclude that the accusatory aspects of the questioning remain most important." *Alfaro*, 386 Ill. App. 3d at 296. The defendant was questioned by two officers in a relatively small interview room and left alone for 40 to 50 minutes, and none of the defendant's family members were present at any time during the questioning.

¶ 76    Applying the facts of the instant case to the modified reasonable person *Braggs* standard, we find the defendant's statement of August 7, 2018, was a custodial interrogation. On balance, we find that the factors establish a custodial interrogation. We do not believe that, under these

32

circumstances, a reasonable person with the defendant's mental capacity would have believed he was free to leave the sheriff's office. We conclude that the circuit court's determination that the defendant was not in custody when he gave an inculpatory statement to detectives on August 7, 2018, is error. As the defendant had not been Mirandized by that time, the trial court erred in denying the defendant's motion to suppress.

¶ 77                    2. *Determination that interview was involuntary*

¶ 78    Even where *Miranda* warnings are not required, the fifth amendment demands that defendant's confession be voluntary. *Slater*, 228 Ill. 2d at 160. The test for voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the particular defendant's will was subjectively overcome at the time he confessed. *Id.* "Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence." *Id.* at 149; see also *Gilliam*, 172 Ill. 2d at 501. In making a voluntariness determination, the totality of the circumstances surrounding the statement is considered, including the defendant's age, intelligence, education, experience, and physical condition at the time of questioning; the legality and duration of detention; the duration of questioning; the presence of *Miranda* warnings; and the presence of any physical or mental abuse. See *In re D.L.H.*, 2015 IL 117341, ¶ 59; see also *Slater*, 228 Ill. 2d at 160.

¶ 79    Many of the factors to be weighed in determining voluntariness are also present in considerations of a determination of custody status for *Miranda* requirements, as discussed in detail above and will not be repeated here. The defendant was 32 years old at the time of the interview, but as described above, was significantly intellectually limited. The defendant's highest level of education was high school, from which he had graduated in 2000, and he had no significant

experience with the criminal justice system except as a victim of debit card theft two years prior. Detective Burge recalled that the defendant appeared "slovenly, dirty[,] as though he might have been working on *** a vehicle or something" at the time of the interview. To his brother's knowledge, the defendant was unemployed, although he did occasionally help with work on cars and scrapped at an automotive shop. The defendant had volunteered to come to the sheriff's office and speak with officers of "his own accord." The defendant had been driven to the sheriff's office in a patrol vehicle because he could not drive himself and no family member would drive him. The defendant waited alone in the interview room prior to questioning for over half an hour, and was interviewed for a little less than an hour. The defendant was not given *Miranda* warnings, but was advised before questioning began that the door was unlocked and that he could leave. The detectives were often outwardly courteous to the defendant. However, the detectives often informed the defendant through their statements that they believed the defendant was being deceptive. When the defendant gave certain responses that the detectives believed to be truthful, the detectives thanked the defendant for "not lying." On one occasion during the interview, a detective warned the defendant that he would know the defendant had been lying when he got the chance to speak with L.B., and that, after that happened, the detective would have to "get all mean."

¶ 80    In summary, what the evidence shows is a defendant who has low intelligence, has an IQ of 46, cannot identify all letters of the alphabet, is illiterate, functions intellectually as a child, cannot drive, is probably unemployable, is probably unable to understand "the nature of the proceedings against him," and functions at the cognitive level of a seven-year-old. The defendant had been found unfit to stand trial and apparently was not capable of comprehending his *Miranda* rights at his second interrogation. These are all factors that "color the lens through which this court

34

necessarily views the circumstances of the police questioning in this case." *In re D.L.H.*, 2015 IL 117341, ¶ 67.

¶ 81    Since the evidence overwhelmingly supports a finding that the defendant's statement was not knowingly and voluntarily made, we conclude that the trial court's decision in denying the defendant's motion to suppress was against the manifest weight of the evidence.

¶ 82                                    B. Harmless Error Argument

¶ 83    The State argues that, even if we find that the trial court erred in denying the defendant's motion to suppress his August 7, 2018, inculpatory statements, we should find that the error was harmless, and affirm the trial court's adjudications of non-acquittal on all three counts. However, "[i]n order for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *People v. St. Pierre*, 122 Ill. 2d 95, 113-14 (1988); see also *People v. Fort*, 2014 IL App (1st) 120037, ¶ 19; and *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). The State bears the burden of proof on this point. *Patterson*, 217 Ill. 2d at 428; see also *People v. Davis*, 393 Ill. App. 3d 114, 132 (2009). Additionally, our supreme court has held that the erroneous admission of a confession into evidence is rarely harmless error because confessions carry "extreme probative weight." *St. Pierre*, 122 Ill. 2d at 114; see also *Fort*, 2014 IL App (1st) 120037, ¶ 19. To determine whether an error is harmless, it is necessary to review the facts of the case and the evidence at trial to determine the effect of the unlawfully admitted evidence upon the outcome of the trial. See *St. Pierre*, 122 Ill. 2d at 114; see also *Davis*, 393 Ill. App. 3d at 133.

¶ 84    The State argues that although it is difficult to determine whether an error was harmless in jury trial cases, it is simple here, where, the defendant was adjudicated non-acquitted in a bench

35

trial and the trial court specifically stated when announcing its ruling that: "the State has made its case without his statement."

¶ 85    We disagree. After thorough review of the record, we find that the State has not demonstrated beyond a reasonable doubt that the erroneous admission of the defendant's August 7, 2018, inculpatory statements into evidence did not enter into the court's decision.

¶ 86    While it may seem a difficult task for the trial court to view evidence at a suppression hearing and thereafter not consider it in evidence, such is the court's responsibility. An order to suppress and exclude may also significantly affect the way a case is thereafter prosecuted and defended. The right to a fair hearing demands that a ruling to suppress results in total exclusion of the suppressed evidence.

¶ 87    We cannot say beyond a reasonable doubt that this occurred here where, in its final ruling, the trial court commented on the evidence sought to be suppressed: "I believe that he was aware that he had done something wrong, that he was in trouble, and that he was not forced to admit anything." This wording indicates that the defendant's statement was viewed, considered, and evaluated by the trial court. The trial court unfortunately leaves the impression that some weight may have been given to the statements. The trial court's comment immediately thereafter that it nevertheless "felt the State's case was strong enough that it would have survived without presenting [the] statement" does not sufficiently assure this court that the denial of the motion to suppress was harmless error. To say that it was not needed after all is not the same as saying it was not considered at all. Neither has the State sufficiently borne its burden of proof in demonstrating to this court that the error was harmless beyond a reasonable doubt. In furtherance of that point, although we do not express any determinative opinion on this subject at this time, we note that the

proper exclusion of the defendant's statement may significantly affect the sufficiency of the evidence, particularly as to the first PCSA count.

¶ 88    Since the trial court's denial of the defendant's motion to suppress his August 7, 2018, statements was not harmless error, we will not address the defendant's sufficiency of the evidence claims. Accordingly, we reverse the trial court's denial of the defendant's motion to suppress; vacate the trial court's adjudications of non-acquittal on all three counts; and remand for a new discharge hearing at which the defendant's August 7, 2018, statements are excluded.

¶ 89                                   III. CONCLUSION

¶ 90    For the foregoing reasons, we reverse the trial court's order denying the defendant's motion to suppress, vacate the defendant's adjudications of non-acquittal, and remand for further proceedings consistent with this decision.


¶ 91    Order reversed; adjudications of non-acquittal vacated; cause remanded.